IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED

JAN 3 0 2018

Clerk, U.S. District Court
District Of Montana
Missoula

DAWN RUSTAD-LINK,

                Plaintiff,

    vs.

PROVIDENCE HEALTH AND
SERVICES and UNUM GROUP
CORPORATION ("UNUM"),

             Defendants.

CV 16–136–M–DWM

OPINION &
ORDER

The question in this case boils down to a simple issue: Who is the

beneficiary of a lawsuit stemming from an ERISA employee's misfortune? Is it

the ERISA plan or is it the unfortunate employee? While the all or nothing

propositions asserted by both parties here are not reasonable interpretations of the

ERISA plan in question, the facts of this case favor the plaintiff. The defendant's

shortcoming, among other mistakes, was to prioritize its plan interpretation to its

financial interest.

Unum Group Corporation ("Unum"), the defendant here, argues that it is

entitled to offset its disability payments for lost income against every penny

recovered because of the employee's misfortune. The unfortunate victim of

-1-

medical malpractice in this case, the plaintiff Dawn Rustad-Link ("Rustad-Link"), argues there should be no offset because her below-the-knee amputation settlement was not for lost income, but encompassed a multiplicity of other damages that are not subject to the ERISA plan's offset provisions. Unum insists that it payed disability benefits regardless of the basis of the claim, whether in this case multiple sclerosis, below-the-knee amputation, or a variety of other medical problems that impact Rustad-Link's entitlement to disability benefits. This being the case, so goes the reasoning, it is entitled to an offset against the entirety of the proceeds of Rustad-Link's medical malpractice settlement.

Rustad-Link's motion for summary judgment is granted as the reasoning supporting it is more persuasive. First, Washington law mandates a *de novo* standard of review. Second, Unum cannot assert the attorney-client privilege against Rustad-Link, its fiduciary, as to communications with counsel that occurred before the parties became adverse. Finally, Unum breached its fiduciary duty to Rustad-Link when it changed her disabling diagnosis following notice of her third-party settlement and deducted against her disability payments.

## BACKGROUND

Rustad-Link is a resident and citizen of Roseglen, Mclean County, North Dakota. (Doc. 11 at 2.) At all times relevant to this action, she was an employee,

or disabled former employee, of Defendant Providence Health and Services at

Providence Saint Joseph Medical Center in Polson, Montana ("Providence"). (*Id.*)

Providence is the policyholder of a long term disability insurance plan, Policy

Number 138177002 (the "Plan"). (Doc. 16-3 at 43; AR 000043.)[1] Unum is the

disability insurance underwriter for the Plan, (Doc. 16-3 at 000003), and is the

claims fiduciary for the Plan, (Doc. 16-3 at 56; AR 000056). As a private,

employer-provided plan, the Plan is governed by the Employee Retirement and

Income Security Act ("ERISA"). 29 U.S.C. §§ 1001 *et seq.*

## I.    Coverage History

Rustad-Link was diagnosed with multiple sclerosis ("MS") in 1996. (Doc.

16-8 at 98; AR 000714.) In 2010, she suffered a below-the-knee amputation

resulting from negligent medical care. (Doc. 16-5 at 2-4; AR 000152-54.) The

amputation occurred after an occlusion in her iliac artery blocked blood flow to

her foot. She applied for disability benefits under the Plan, and Unum informed

her on June 16, 2010, that her MS was a pre-existing condition that would not be

---

[1] Unless otherwise noted, the facts are taken from the certified
administrative record provided by Unum. (Doc. 16.) Citations are to both the
document numbers (*e.g.,* Doc. 16-3) and the administrative record (*e.g.,* AR
001256).

-3-

covered for a period of 12 months.[2]  (Doc. 26 at ¶ 3; AR 000156-57.)

On June 21, 2010, Rustad-Link responded that the amputation, not the MS, had disabled her.  (Doc. 16-5 at 8-9; AR 000158-59.)  She stated in part that "multiple sclerosis is not the reason for filing this claim . . . . This amputation is the reason for the disability claim."  (*Id.*)

On June 11, 2010, Judith L. Gustafson, a certified nurse practitioner, identified MS as Rustad-Link's primary disability, her amputation as her secondary disability, and recorded her assessment in an Unum disability claim form.  (Doc. 16-4 at 113-15; AR 000113-15.)  She noted Rustad-Link had severe weakness and tremors, and that her disability was likely permanent.  (*Id.*)  On June 14, 2010, in a separate evaluation, Daniel Ramsch, M.D., identified the amputation as the primary disability, the MS as secondary, and also indicated Rustad-Link's disability was likely permanent.  (Doc. 16-5 at 2-5; AR 00152-54.)

On June 23, 2010, Unum granted Rustad-Link six month short-term disability under the Plan.  (Doc. 16-4 at 146-47; AR 000146-47.)  Unum did not communicate the specific condition or conditions that supported its disability

---

[2] The terms of the Plan provided that a pre-existing condition will not be covered if the plan participant is diagnosed with or treated for the condition in the three months preceding the effective date of coverage, and a disability begins related to the pre-existing condition in the first 12 months following the effective date of coverage or the date coverage is increased.  (Doc. 16-3 at 38; AR 000038.)

determination to Rustad-Link. (*Id.*) Rustad-Link's attending physician, Mark
Weber, informed Social Security Disability, noting that Rustad-Link's "[MS] . . .
along with her new amputation has resulted in profound impariment of her
functional mobility." (Doc. 16-8 at 132; AR 000748.) On July 23, 2010, Rustad-
Link submitted a disability report to Social Security Disability listing the
following physical and mental conditions that limited her ability to work: "(1)
multiple sclerosis; (2) right transtibial amputation; (3) right iliac artery occlusion;
(4) chronic gastritis; (5) hypokalemia; (6) chronic pain; (7) phantom limb pain; (8)
anemia." (Doc. 16-8 at 91; AR 000707.)

On September 7, 2010, an Unum claim director, Tom Salce, held a round-
table review of Rustad-Link's file to determine approval of her long-term
disability. (Doc. 16-8 at 22; AR 000637.) The review confirmed disability due to
the amputation, and indicated recovery "would be 4-6 months from present as
[claimant] indicated she is still cleaning wound." (*Id.*) It also noted it was
"[u]nclear what [Rustad-Link's] work capacity will be as she also has MS," and
that it was "[n]ot clear why [restrictions and limitations] for [Rustad-Link's] [right
upper extremity]" existed. ( *Id.*) Also on September 7, 2010, Unum granted
Rustad-Link's request for Long Term Disability benefits. (Doc. 16-8 at 30; AR
000646.) The letter notifying Rustad-Link did not explain what condition or

conditions supported its disability determination. (*Id.*)

On February 28, 2011, Unum received an updated physician's statement from Rustad-Link's primary care provider, certified nurse practitioner Michelle Hellwig, which once again identified her amputation as the primary disability and MS as the secondary disability. (Doc. 16-12 at 134-36; AR 001350-52.) On March 3, 2011, Unum had another round-table review and noted that Rustad-Link's restrictions and limitations were medically supported but that "fine motor skills [were] not supported since [Rustad-Link] had mild tremors prior to [the amputation]." (Doc. 16-12 at 146; AR 001362.) Hellwig provided Unum another attending physician's statement on September 14, 2011, which also indicated the amputation was the primary cause of disability, with MS and chronic pain as secondary diagnoses. (Doc. 16-13 at 53-55; AR 001419-22.) The assessment noted "pain, limp, [and] tremors" as clinical findings supporting the diagnosis. (*Id.*) On November 18, 2011, Unum held another round-table review, concluding that Rustad-Link's "[injury causing disability] should be updated to reflect [below knee amputation] and MS as secondary." (Doc. 16-13 at 119; AR 001485.) Rustad-Link was not notified of the change. (Doc. 26 at ¶ 11.)

Unum wrote Rustad-Link on November 21, 2011, to inform her that, beginning in August 2012, her coverage would be subject to a stricter definition of

disability as she reached 24 months of payments. (Doc. 16-14 at 36-38; AR 001554-56.) Unum received an Attending Physician's Statement from neurologist Stephen Johnson[3] on August 21, 2012, which identified MS as the primary disability diagnosis, and did not identify any other causes of disability. (Doc. 16-14 at 147-49; AR 001665-67.) Unum prepared a summary of Rustad-Link's condition on September 14, 2012, noting she had been awarded Social Security disability for her amputation and her MS, and that a vocational rehabilitation consultant noted it might be possible to identify light or sedentary employment. (Doc. 16-15 at 37; AR 001705.) Unum determined Rustad-Link's "Injury Causing Disability" should be updated to MS. (*Id.*)

On October 7, 2012, Helwig provided another attending physician's statement, which again stated Rustad-Link's primary disability diagnosis impacting functional capacity was her amputation, and that secondary diagnoses were MS and chronic pain. (Doc. 16-15 at 71-74; AR 001739-42.) Unum held another round-table review on October 22, 2012, in which Rustad-Link's medical history was reviewed, and concluding that Rustad-Link's restrictions and limitations regarding her upper extremities due to MS, the poor labor market in

---

[3] The statement is signed by Jennifer Krueger, a certified Physician's Assistant, for Dr. Johnson. (Doc. 16-14 at 149; AR 001667.)

North Dakota (where she had moved), and the likelihood that her conditions would deteriorate qualified her for continued long-term disability. (Doc. 16-15 at 101-02; AR 001769-70.) The review also concluded Rustad-Link's injury causing disability should be updated to MS. (*Id.*) Unum informed Rustad-Link that continuation of her disability payments under the stricter definition of disability had been approved that same day. (Doc. 16-15 at 116-18; AR 001784-86.) Unum did not advise Rustad-Link that her injury causing disability had been updated to MS. (*Id.*)

## II. The Settlement Deduction

On February 14, 2014, Rustad-Link's attorney informed Unum of a pending third-party settlement regarding her amputation. (Doc. 16-17 at 110-11; AR 000283-84.) Unum responded with a letter asserting a right to recover benefits as deductible sources of income under the Plan. (Doc. 16-17 at 137; AR 002118.) Unum then began the process of assessing whether Rustad-Link's settlement would qualify as a deductible source of income. (Doc. 16-17 at 135; AR 002116.) On August 19, 2014, Unum sent another letter, requesting information regarding Rustad-Link's settlement. (Doc. 16-17 at 141-42; AR 002122-23.)

Rustad-Link's attorney wrote back on September 15, 2014. (Doc. 16-17 at 145-46; AR 002126-27.) The letter informed Unum that Rustad-Link's settlement

was solely on the basis of her amputation, and did not involve any recovery for her MS. (*Id.*) Following receipt of that letter, Unum consulted in-house counsel and initially concluded that the settlement would not qualify for application of the third party settlement offset because it would represent attorney fees and past and future medical expenses. (Doc. 11 at ¶ 29; Doc. 3-28.)[4] Unum also concluded that a medical review was not necessary. (Doc. 3-29.) Despite these conclusions, Unum's Financial Recovery Unit then initiated an evaluation of Rustad-Link's injury causing disability to resolve whether Unum would "be supporting the claim for MS despite the amputation." (Doc. 16-18 at 12; AR 002146.)

On November 5, 2014, Unum concluded that "[t]here is no indication at this time that [Rustad-Link's] MS [symptoms] have worsened to suggest that they rise to the level that would impact [her] functional capacity. Any support for decrease in function appears to be related to her [amputation]. It does not appear that [she] had an MS exacerbation sepsis and [amputation], and her [symptoms] increase was more likely to her noncompliance with medication. [Injury Causing Disability]: Need to switch [Injury Causing Disability]." (Doc. 16-18 at 27; AR 002167.) Unum subsequently informed Rustad-Link that "MS is not a basis for [Rustad-

---

[4] Unum claims the internal communication detailing this decision is protected by the attorney-client privilege. However, the fiduciary exception to the attorney-client privilege applies to this document. *See* Analysis, Section II, *infra*.

Link's] disability and that she is impaired only as a result of her below-the-knee amputation. This condition alone causes her current inability to work in any gainful occupation." (Doc. 16-18 at 30-31; AR 002171-72.) Unum informed Rustad-Link that as a result of her third-party settlement, Unum had overpaid benefits in the amount of $46,856.28, and that it would begin reducing her payments by the monthly amount of $1,924.60, resulting in a monthly payment of $115.71. (Doc. 16-18 at 35-36; AR 002176-77.)

Rustad-Link's attorney responded December 2, 2014, noting that Unum's position "ignore[d] the unambiguous medical opinions of all providers that the MS and the amputation combine to render her disabled." (Doc. 16-18 at 43; AR 002184.) The letter also disputed the pro-ration of the lump sum settlement for life long losses, which it asserted should have been calculated over Rustad-Link's life expectancy instead of her work-life. ( *Id.*) In a December 10, 2014 letter, Unum responded that it was "not required under the policy to apportion a deductible source of income with respect to the disabling diagnostic condition associated with that source of income," and that "the third party settlement . . . [would] be considered a deductible source of income for the duration of [Rustad-Link's] claim." (Doc. 16-18 at 55; AR 002199.) On January 7, 2015, Unum sent a follow-up letter notifying counsel that it had begun to reimburse itself for the

"overpayments" by deducting from Rustad-Links' monthly disability payments, and that Rustad-Link "w[ould] not receive a benefit payment until the overpayment [was] paid in full." (Doc. 16-18 at 70-72; AR 002215-17.) Rustad-Link timely appealed the decision with Unum on June 30, 2015. (Doc. 16-18 at 119; AR 002267.) Unum denied the appeal on July 14, 2015. (Doc. 16-18 at 130-33; AR 002281-84.) Unum again asserted the Plan did not require it "to consider an apportionment of the settlement with respect to the disabling condition(s) associated with th[e] deductible source of income." (Doc. 16-18 at 131; AR 002282.)

## III. The Present Case

Rustad-Link filed suit on October 20, 2016. (Doc. 1.) She claims Unum's assertion of the offset and repayment provisions constitute a breach of the terms of the Plan and a wrongful refusal to pay the benefits due, in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3). (Doc. 3 at 15.) She seeks an award of all disability benefits available under the Plan, including reimbursement for past benefits wrongly withheld, prejudgment interest, costs, and attorney's fees. (Doc. 3 at 16.) Both parties have moved for summary judgment, and agree that resolution of this matter is appropriate on the administrative record. (Docs. 17, 24).

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgement—factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and alteration omitted).

## ANALYSIS

## I.     Standard of Review

A threshold question here involves the standard of review regarding Unum's decision to offset against Rustad-Link's personal injury settlement. Rustad-Link insists *de novo* review should be applied, (Doc. 19 at 18), while Unum argues abuse of discretion is the appropriate standard of review, (Doc. 25 at 5). Rustad-Link has the better argument, although, as discussed below, the

outcome is the same under either standard.

The Supreme Court has held that "a denial of benefits challenged under

§ 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 115 (1989). The Unum Plan contains a "discretionary

clause," which provides as follows:

> The Plan, acting through the Plan Administrator, delegates to Unum and
> its affiliate Unum Group discretionary authority to make benefit
> determinations under the Plan. Unum and Unum Group may act directly
> or through their employees and agents or further delegate their authority
> through contracts, letters or other documentation or procedures to other
> affiliates, persons or entities. Benefit determinations include
> determining eligibility for benefits and the amount of any benefits,
> resolving factual disputes, and interpreting and enforcing the provisions
> of the Plan. All benefit determinations must be reasonable and based on
> the terms of the Plan and the facts and circumstances of each claim.

(Doc. 16-3 at 59; AR 000059.)

The Ninth Circuit "read[s] *Firestone* to require abuse of discretion review

whenever an ERISA plan grants discretion to the plan administrator, but a review

informed by the nature, extent, and effect on the decision-making process of any

conflict of interest that may appear in the record. This standard applies to the kind

of inherent conflict that exists when a plan administrator both administers the plan

-13-

and funds it, as well as to other forms of conflict." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006). In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily . . . than a minor, technical conflict might." *Id.* at 968.

However, *Firestone* review is not the end of the story. In 2009, the State of Washington prohibited the use of discretionary clauses in disability insurance policies. Wash. Admin. Code ("WAC") 284-96-012. The Washington regulation (the "Regulation") provides that "[n]o disability insurance policy may contain a discretionary clause."[5] *Id.* It defines a "discretionary clause" as

> a provision that purports to reserve discretion to an insurer, its agents, officers, employees, or designees in interpreting the terms of a policy or deciding eligibility for benefits, or requires deference to such interpretations or decisions, including a provision that provides . . .

---

[5] The parties agree, without discussion, that Washington law governs the Plan. (Doc. 27 at 16.) They appear to be correct. First, the Plan itself provides it is governed by Washington law. (Doc. 16-3 at 1.) Second, ERISA contains a savings clause providing that state laws regulating insurance, banking, and securities are not preempted. 29 U.S.C. § 1144(b)(2)(A). The Regulation has been found to apply in previous cases. *See Landree v. Prudential Ins. Co. of Am.*, 833 F. Supp. 2d 1266, 1274 (W.D. Wash. 2011) ("ERISA does not preempt the Regulation because the Regulation satisfies the two-part [savings clause] test laid out in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003)].").

-14-

[t]hat the standard of review of an insurer's interpretation of the policy or claims decision is other than a de novo review.

WAC 284-96-012(1)(f). Under Washington law, then, *de novo* review is required. However, while the parties agree that Washington law applies, they do not agree that the Regulation does.

## A. The Regulation

Rustad-Link argues the Regulation governs the standard of review here. (Doc. 19 at 19.) Unum responds that the Regulation does not void the Policy's discretionary language. (Doc. 25 at 10.) Once again, Rustad-Link has the better argument.

Rustad-Link claims the Regulation applies because the Plan renewed after the enactment of the Regulation, and is thereby subject to statutes and regulation current at the time of renewal. She insists that, in any event, to enforce the discretionary clause would violate the "strong public policy" in Washington. (Doc. 19 at 20.) Unum responds that, because the Regulation became effective after the Plan, it does not void the discretionary clause, (Doc. 25 at 10), and insists that to apply the Regulation retroactively would interfere with its vested contract rights, (Doc. 28 at 6). Unum is correct as to the initial premises of its argument: first, that the Regulation is not retroactive, and second, that the Plan has an

-15-

effective date of January 1, 2007.[6] (Doc. 16-6 at 41.) But that proposition is not enough for its argument to succeed.

While there do not appear to be any Washington state cases addressing the applicability of the Regulation to disability insurance policies effective before 2009, a string of (primarily unpublished) Western District of Washington cases support Rustad-Link's argument that the Regulation applies in such situations. Most important here is *Murray v. Anderson Bjornstad Kane Jacobs, Inc.*, where Judge Lasnik assessed the applicability of the Regulation at the time the plaintiff's cause of action against his insurer accrued. 2011 WL 617384, *4 (W.D. Wash. Feb. 10, 2011). The court concluded the Regulation applied where the plaintiff's cause of action accrued after the Regulation was enacted. *Id.* In so holding, the court cited (1) the Revised Code of Washington Annotated (RCWA) 48.18.510 ("Any insurance policy . . . which contains any condition or provision not in compliance with the requirements of this code, shall not be rendered invalid thereby, but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy . . . been in full compliance with this code."); (2) the Washington Office of Insurance Commissioner's proposed

---

[6] The parties agree that the Regulation does not apply retroactively. (Doc. 25 at 10.)

-16-

rule statement for the Regulation, where the Commissioner stated the intended effect of the Regulation was for carriers to administer "current contracts or policies . . . as though they did not contain discretionary clauses," Wash. State Register 09–07–030; and (3) *Seattle-First Nat'l. Bank v. Wash. Ins. Guar. Ass'n*, 94 Wash. App. 744, 753 (Wash. Ct. App. 1999) ("Contracts for insurance must comply with statutes. Non-compliant contract provisions will not invalidate the contract; rather, we construe such provisions to comply with the statutes.").

At least one other Western District of Washington decision tracks *Murray*'s lead in holding that Regulation applies to ERISA-governed plans in effect before its enactment. In *Treves v. Union Security Insurance Company, LLC*, 2014 WL 325149 (W.D. Wash., Jan. 29, 2014), the district court considered whether the Regulation applied to a discretionary clause in a disability plan which went into effect in 2002 (seven years before the Regulation). The court agreed with the reasoning of the *Murray* decision.

Still other Western District cases have held the Regulation applies without a discussion of the effective policy date. *See Bourland v. Hartford Life & Acc. Ins. Co.*, 2014 WL 4748218, \*2, (W.D. Wash., Sept. 24, 2014); *Mirick v. Prudential Ins. Co. of Am.*, 100 F. Supp. 3d 1094, 1097 (W.D.Wash. 2015); *Pearson v. Aetna Life Ins. Co.*, 2016 WL 2745299, \*4 n.9 (W.D. Wash., May 10, 2016); *Maher v.*

*Aetna Life Ins. Co.*, 186 F. Supp. 3d 1117, 1125 (W.D. Wash. 2016) ("Though little discussed in Washington cases, courts in this district have uniformly applied the provision to invalidate grants of authority in insurance policies."). While Washington state courts have not spoken to the issue, a growing number of federal decisions interpreting Washington state law provide persuasive authority that the Regulation should apply here. Taken together, these cases show that the Regulation is applied where it was in effect at the time a claim arose. That view comports with the plain language of the Regulation itself, which simply provides that "[n]o disability insurance policy may contain a discretionary clause." WAC 284-96-012.

Unum's reliance on *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008), is not persuasive. There, the Ninth Circuit concluded the California Insurance Commissioner's revocation of the Certificate of Insurance in the ERISA-qualified long-term disability policy at issue was ineffective because California statute did not permit the Commissioner to nullify a discretionary clause retroactively. *Id.* at 867. As the *Murray* decision noted, unlike the California statute, which "allows the commissioner to withdraw approval of the filing of any policy . . . [,] WAC 284-96-012 does not establish similar parameters within which Washington's Insurance Commissioner may

exercise discretion to approve or disapprove insurance policies. Rather, it
prohibits discretionary clauses in all disability policies outright." 2011 WL
617384, at *3. *Saffon*'s holding regarding a different regulation from a different
state does not support Unum's argument here.

Unum also relies on *Landree v. Prudential Insurance Company of America*,
2011 WL 3438860 (W.D. Wash. Aug. 5, 2011). (Doc. 25 at 12.) While *Landree*
involves Washington law, Unum's reliance is nevertheless misplaced. In *Landree*,
the district court reconsidered its earlier decision to apply *de novo* review to
Prudential's decision to deny disability benefits where the decision to deny was
finalized in 2008, before the enactment of the Regulation. 2011 WL 348860, at
*6. The court concluded that "[t]he Regulation does not apply retroactively to
Prudential's decision to deny benefits because Prudential had a vested right in a
deferential review and Prudential made the decision before the Regulation was
issued." *Id.* at *8. Critically, the district court specified that it "expresse[d] no
opinion on whether the Regulation would apply retroactively to an administrator's
decision made *after* the Regulation was issued." *Id.* at *7 (emphasis in original).
*Landree* is therefore not at odds with *Murray*, but simply reflects *Landree*'s rule
that the Regulation applies if it was in effect at the time a plaintiff's cause of
action accrued—in this case, at the time Unum decided to offset Rustad-Link's

settlement.

Finally, Unum looks to several district court decisions from other circuits to support its argument that a plan's "Anniversary Date" does not make it subject to "subsequently-effective, prospective-only prohibition on discretionary clauses." (Doc. 25 at 13.) Two of these cases are distinguishable because the state regulations with which they dealt specified that they applied to plans effective or renewed after the regulation's effective date. *See Owens v. Liberty Life*, 184 F. Supp. 3d 580, 585 (W.D. Ky. 2016) (regulation applied to "all disability income policies issued in [Kentucky] which are issued *or renewed on and after March 1, 2013*" (emphasis in original)); *Rogers v. Reliance Std. Life Ins. Co.*, 2015 WL 2148406, *7 (N.D. Ill. May 6, 2016) (the operative regulation applied "to policies that renew at any time beyond February 1, 2011").

The third case, *Golden v. Guardian Life Insurance Company of America*, 2010 WL 2293390 (N.D. Ill. June 1, 2010), is legally and factually distinct from this case. There, the court found the attachment of an amendment to a disability policy did not constitute renewal of the policy under Illinois law. *Id.* at *7-8. Under Washington law, an insurer must renew any insurance policy cancellable at the option of the insurer unless exceptions not applicable here exist. RCWA 48.18.2901(1), 48.18.290. Further, "any policy with no fixed expiration date, shall

. . . be considered as if written for successive policy periods or terms of one year."

RCWA 48.18.2901. In this case, the Plan renews every year on January 1.

Additionally, the Plan at issue here is prefaced with an Amendment stating that

"[t]he entire policy is replaced by the policy attached to this amendment," and with

an effective date of January 1, 2010. (Doc. 16-16 at 40; AR 000340.) Finally,

regardless of whether the Plan renews, the Washington federal cases discussed

above have applied the Regulation at the time benefits are denied, not at the time a

plan becomes effective.

De *novo* review is appropriate based on Washington law and federal district

courts' interpretation of that law in analogous circumstances.[7]

## B.   Abuse of discretion review

Finally, even if the Regulation does not apply, Unum's structural conflict of

---

[7] Rustad-Link also argues the discretionary clause violates Washington state public policy. (Doc. 19 at 21.) Because the Regulation applies to the Plan, whether Washington public policy requires its application is moot. That said, Rustad-Link is correct that "Washington courts will not implement a choice of law provision if it conflicts with a fundamental state policy." *Ito Int'l Corp. v. Prescott, Inc.*, 83 Wash. App. 282, 288 (1996) (citing *Rutter v. BX of Tri-Cities, Inc.*, 60 Wash. App. 743, 746 (1991)). Rustad-Link also points out that, in at least one case, a federal court has declined to enforce a discretionary clause because to do so would violate Washington's policy against them. *Flaaen v. Principal Life Ins. Co., Inc.,* 226 F. Supp. 3d 1162, 1166-68 (W.D. Wash. 2016) (holding discretionary clause in disability plan governed by Texas law was unenforceable). Thus, while not necessary for the purpose of determining whether the Regulation applies here, Washington public policy supports *de novo* review.

interest requires a more searching abuse of discretion review. Where a fiduciary "both decides who gets benefits and pays for them," that fiduciary "has a direct financial incentive to deny claims," and therefore "labors under . . . a conflict of interest." *Saffon*, 522 F.3d at 868. Unum is a fiduciary because it is "an entity with 'any discretionary authority' in the 'administration of' an ERISA plan." *Id.* at 866 (quoting 29 U.S.C. § 1002(21)(A)). As such, even if abuse of discretion review applies, Unum's decision to deduct from Rustad-Link's disability payments must be viewed through the lens of its structural conflict of interest—it had a "direct financial incentive," *id.* at 868, to offset its payments to Rustad-Link. As outlined above, that conflict is apparent in the record, where Unum's determination of Rustad-Link's disabling condition changed from amputation to MS over time, but reverted to MS when it became apparent settlement money might be available for an offset. While Unum argues it pays regardless of disability categorization, it cannot then twist the Plan language to conclude as a consequence that it gets to offset any source of compensation by denominating the source as "income".

## II.    Attorney-Client Privilege

Unum claims attorney-client privilege over a number of documents detailing consultations betwen Unum's claims and financial employees and its in-house

counsel. (Doc. 16-2.) Rustad-Link argues Unum cannot assert the privilege

because at the time of the communications it owed her a fiduciary duty, meaning

the fiduciary exception to the attorney-client privilege should apply. (Doc. 19 at

30; Doc. 27 at 23.) Unum argues both that it can assert the privilege, and that the

attorney-client communications at issue are irrelevant when a court conducts a *de

novo* review. (Doc. 25 at 17–18.)

The fiduciary exception to the attorney-client privilege prevents Unum from

asserting the privilege over communications with its in-house counsel that

occurred while Unum was acting in a fiduciary capacity toward its plan

beneficiary, Rustad-Link.

"'As applied in the ERISA context, the fiduciary exception provides that an

employer acting in the capacity of ERISA fiduciary is disabled from asserting the

attorney-client privilege against plan beneficiaries on matters of plan

administration.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 931 (9th

Cir. 2012) (quoting *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999)).

"The duty of an ERISA fiduciary to disclose all information regarding plan

administration applies . . . to insurance companies. . . ." *Id.* Whether the fiduciary

exception applies depends on the nature of the legal advice sought:

[T]he case authorities mark out two ends of a spectrum. On the one

-23-

hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact.

*Mett*, 178 F.3d at 1064. In *Stephan*, after an *in camera* review, the Ninth Circuit concluded that "notes of conversations between Unum claims analysts and Unum's in-house counsel about how the insurance policy under which Stephan was covered ought to be interpreted and whether Stephan's bonus ought to be considered monthly earnings within the meaning the Plan" fell within the fiduciary exception and thus were not protected by the attorney-client privilege. 697 F.3d at 932. It rejected Unum's argument that because the memoranda were created after Unum had received correspondence from Stephan's counsel, and therefore there was "an indication that the parties m[ight] become adverse," the fiduciary exception ought not apply. *Id.* at 933. Instead, the *Stephan* court "agree[d] with the weight of authority" that "it is not until after the final determination—that is, after the final administrative appeal—that the interests of the Plan fiduciary and the beneficiary diverge for purposes of application of the fiduciary exception." *Id.*

Unum relies on *Blaj v. Unum Life Insurance Co. of America*, 2014 WL 2735182 (N.D. Cal. June 16, 2014) and *Healy v. Fortis Benefits Insurance Co.*,

2014 WL 5768537 (N.D. Cal. Nov. 5, 2014), to argue it does not need to disclose the disputed communications if *de novo* review applies. (Doc. 25 at 17.) In *Blaj*, the court noted that, when a *de novo* standard of review is applied to the plan administrator's decision, "a district court should determine whether the plaintiff is entitled to benefits based on the evidence in the administrative record, and evidence outside the administrative record may only be considered in 'certain limited circumstances.'" 2014 WL 2735182, at *2 (citing *Opeta v. Nw. Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007)). It therefore held that "any opinions or memoranda regarding Plaintiff's claim [were] irrelevant, because any credibility regarding the claim determination [was] not at issue under the *de novo* standard of review." *Id.* at *4. In *Healy*, the court also relied on the restricted scope of *de novo* review to limit disclosure of communications between the defendant parties. 2014 WL 5768537, at *2.

Both *Blaj* and *Healy* stressed the distinction between the administrative record and extrinsic evidence. In *Opeta*, the Ninth Circuit emphasized the rule that "in most cases only the evidence that was before the plan administrator at the time of determination should be considered" in a *de novo* review. 484 F.3d at 1217 (citations and alterations omitted). Here, the contested documents were withheld from the administrative record on the basis of attorney-client privilege.

(Doc. 16-2 at 2-3.) But as Unum explained at the hearing in this case, the administrative record is nothing more than Rustad-Link's case file—and her case file included the communications with counsel Unum now seeks to protect, which were only withheld once litigation began. Accordingly, the distinction between extrinsic and administrative record evidence is based solely on Unum's assertion of attorney-client privilege. Unum's argument is circular—it asserts the privilege on the basis of the administrative record/extrinsic evidence divide, while having itself created that divide in the first instance. Neither *Blaj* nor *Healy* address this logical inconsistency, and in any event neither are binding here. In the ERISA context, "[t]he district court may try the case on the record that the administrator had before it." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). In this case, that record includes Unum's communications with its counsel.

Rustad-Link correctly argues that the fiduciary exception to the attorney-client privilege applies. As in *Stephan*, that means "it is not until after the final determination—that is, after the final administrative appeal—that the interests of the Plan fiduciary and the beneficiary diverge for purposes of application of the fiduciary exception." 697 F.3d at 933. Of the documents Unum claims are protected by attorney-client privilege, 22 predate Unum's denial of Rustad-Link's

appeal, with one more occurring on the same date as the denial, July 14, 2015.

(Doc. 16-2 at 2-3.) Those documents are thus subject to the fiduciary exception, and must be produced.[8] The remaining documents post-date Unum's denial of Rustad-Link's appeal, and therefore fall on the end of the spectrum "where a plan fiduciary retains counsel in order to defend [itself] against the plan beneficiar[y]." *Mett*, 178 F.3d at 1064. Those documents do not need to be produced.

## III. Witholding of Benefits

Rustad-Link argues Unum breached its fiduciary duty to her when it interpreted the Plan to suit its own financial interest by determining it was entitled to offset her benefit payments based on the settlement she received for her amputation. (Doc. 19 at 24; Doc. 27 at 10.) Unum insists that it correctly interpreted the Plan, specifically that its interpretation of the undefined term "same

---

[8] Unum also asserts that an internal communication with in-house counsel (Doc. 3-28) regarding Rustad-Link's amputation settlement is privileged, even though it sent the communication to Rustad-Link as part of her claim file on July 24, 2015. (Doc. 27 at 25.) Unum misses the point. First, the document was created September 25, 2014, before Unum denied Rustad-Link's appeal; second, voluntarily disclosing privileged documents to third parties will generally destroy the [attorney-client] privilege," *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012), and no evidence suggests Unum did not disclose voluntarily; third, Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure, on which Unum relies, places the burden to return a privileged document on the opposing party *after* the disclosing party notifies it and Unum did not assert the privilege until after Rustad-Link filed her complaint.

disability" was correct. (Doc. 25 at 18; Doc. 28 at 9.) As to the policy

interpretation, Rustad-Link has the better argument.

Assessing the arguments begins with examining the language of the Plan.

The Plan provides for a number of different "eligible groups" in which insureds

fall depending on employer. (Doc. 16-3 at 5; AR 000005.) As an employee of

Providence in Polson, Rustad-Link was in "Eligible Group 12". The Plan defines

"disability" for those in Eligible Group 12:

> **HOW DOES UNUM DEFINE DISABILITY?**
> **Groups 1 through 4, 7, 8, 11, 12 and 13**
> You are disabled when Unum determines that:
> −You are **limited** from performing the **material and substantial duties**
> of your **regular occupation** due to your **sickness** or **injury**; and
> −you have a 20% or more loss in your **indexed monthly earnings** due
> to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines
> that due to the same sickness or injury, you are unable to perform the
> duties of any **gainful occupation** for which you are reasonably fitted by
> education, training or experience.
>
> You must be under the regular care of a physician in order to be
> considered disabled.

(Doc. 16-3 at 26; AR 000026) (emphasis in original to denote defined terms).

"**Injury** means a bodily injury that is the direct result of an accident and not

related to any other cause. Disability must begin while you are covered under the

plan." (Doc. 16-3 at 46; AR 000046.) "**Sickness** means an illness or disease.

-28-

Disability must begin while you are covered under the plan." (Doc. 16-3 at 49; AR 000049.)

The Plan provides that it will "[s]ubtract from your gross disability payment any **deductible sources of income.**" (Doc. 16-3 at 29; AR 000029.) It defines deductible sources of income, in part, as "[t]he amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise." (Doc. 16-3 at 33; AR 000033.) The Plan also provides that, "[w]ith the exception of retirement payments, Unum will only subtract deductible sources of income which are payable as a result of the same disability." *Id.* "Same disability" is not a defined term.

## A.   "Same disability"

Rustad-Link argues that "same disability" means the same medical condition. (Doc. 27 at 12.) Unum disagrees, insisting "same disability" means the same time period of disability. Unum's interpretation is impermissibly self-serving. As discussed in Section I, *supra*, *de novo* review of Unum's interpretation is appropriate.[9] To determine whether Unum's interpretation of the

---

[9] The result would be the same under abuse of discretion review, in light of "the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it," as Unum does here. *Abatie*, 458 F.3d at 967.

Plan was correct, the first step is to interpret the contract. *Cf. Firestone*, 489 U.S. at 114 ("[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue.").

"[T]he rule that contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) (quotation omitted, alteration original). "'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)). But where the language of the ERISA-governed plan is ambiguous, those ambiguities must be construed against the insurer. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-40 (9th Cir. 1990). Under Washington law, a clause in an insurance contract "is ambiguous only when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) (citation omitted). The insurance contract is "consider[ed] . . . as a whole, and . . . give[n] a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (citation omitted). The Plan itself requires that "[a]ll benefit determinations must be reasonable and

-30-

based on the terms of the Plan and the facts and circumstances of each claim."
(Doc. 16-3 at 59; AR 000059.)

As stated above, the Plan provides that Unum may deduct third party
settlements from its benefits payments when those settlements "are payable as a
result of the same disability." "Same disability" is not defined. "Disability," per
the Plan, is due either to "sickness or injury." Both the definition of "sickness"
and "injury" include that they must begin while the insured is covered. However,
neither they nor the definition of "disability" include language stating or implying
that disability constitutes a time period. The plain language of the Plan supports
Rustad-Link's interpretation, not Unum's. Moreover, even were the definition of
"same disability" a close call, "ambiguities must be construed against the insurer."
*Kunin*, 910 F.2d at 539-40.

Unum's relies on several out-of-circuit cases for the proposition that "same
disability" means the time period of disability. These cases do not carry the day.
In *Backquie v. Liberty Mutual Insurance Co.*, 435 F. Supp 2d 318 (S.D.N.Y.
2006), *aff'd*, *Backquie v. Liberty Mutual Insurance Company*, 247 Fed. Appx. 296
(2d Cir. 2007), the courts applied arbitrary and capricious, not *de novo*, review.
As Rustad-Link points out, the logic of the *Backquie* decision, which held that the
definition of "same disability" is best understood as the effect of a diagnosis,

rather than the diagnosis itself, is flawed. By that logic, an ERISA administrator could deduct against third party settlements for *any* kind of injury or sickness during the time period it paid disability benefits, an interpretation that favors the insurer at the expense of the insured. (Doc. 27 at 14.) Rustad-Link also accurately notes that Unum's assertion that "same disability" does not mean same medical condition is undercut by its decision to switch Rustad-Link's injury causing disability from MS back to amputation after it learned of her settlement, due to her amputation and a settlement agreement that excludes "income". (*Id.*)

Unum also relies on *Pettit v. UnumProvident Corp.*, 774 F. Supp. 2d 970 (S.D. Iowa 2011). However, the *Pettit* court applied the abuse of discretion, rather than *de novo* standard, to conclude that Unum's interpretation was "reasonable." *Id.* at 979, 984. *Pettit* is also subject to the logical inconsistency present in *Blackquie*. Unum's interpretation of the Plan language is impermissibly self-serving.

**B.    Reinstatement of benefits**

Rustad-Link seeks all disability benefits available under the Plan, including reimbursement for past benefits wrongfully withheld. (Doc. 3 at 16.) ERISA provides for the "recover[y] of benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to

future benefits under the terms of the plan." 29 US.C. § 1132(a)(1)(B). It is thus necessary to decide what benefits Rustad-Link is entitled to under the Plan, given that the record shows her disability involves both MS and amputation.

She argues Unum changed her injury causing disability designation from MS to amputation to take advantage of her third-party settlement. (Doc. 27 at 7.) The record supports her argument. Unum determined Rustad-Link's disabling injury was MS in 2012. (Doc. 16-15 at 37.) In 2014, after Rustad-Link informed Unum of her settlement, Unum changed its assessment. (Doc. 16-18 at 26-27, 30.) It did so apparently not as a result of any new medical information—as none is reflected in the record—but to take advantage of the settlement by treating the entirety of her misfortune as income.

The Plan does not provide for apportionment based on different medical conditions, as Unum's correspondence with Rustad-Link emphasize. On November 6, 2014, after deciding to deduct against Rustad-Link's benefit payments, Unum informed her that "[u]pon review of Ms. Rustad-Link's medical records, it is apparent that her condition of MS is not a basis for her disability and that she is impaired only as a result of her below-the-knee amputation. This condition alone causes her current inability to work in any gainful occupation." (Doc. 16-18 at 30-31; AR 0002170-71.) In its correspondence with Rustad-Link

-33-

following its decision to deduct from her benefit payments, Unum also stated:

> [w]e are not required under the policy to apportion a deductible source of income with respect to the disabling diagnostic condition associated with that source of income. In this case, the third party settlement received by Ms. Rustad-Link will be considered a deductible source of income for the duration of her claim.

(Doc. 16-18 at 55; AR 002199.)

Where the Plan does not require Unum to apportion a deductible source of income with respect to the disabling condition, allowing it to apportion to Rustad-Link's detriment would not be a reasonable benefit determination.

Examination of the Plan language also shows Unum's assertion that the entirety of Rustad-Link's settlement constitutes a deductible source of income casts too wide a net. The Plan lists seven deductible sources of income. (Doc. 16-3 at 32-33; AR 000032-33.) The first six deductible sources are amounts received (1) under worker's compensation or similar laws; (2) as disability income payments under state law, automobile liability insurance policy, group insurance, or government retirement system; (3) as disability payments under Social Security; (4) as retirement payments under Social Security; (5) as disability payments under an employer's retirement plan; and (6) under the Jones Act.[10] (*Id.*) In contrast, the

---

[10] The Jones Act provides a cause of action for personal injury or death of a seaman. 46 U.S.C. § 30104.

-34-

seventh deductible source—the one at issue here—provides that Unum may offset against amounts received as third party "judgment[s], settlement[s] or otherwise." This list can be read one of two ways: either the seventh deductible source carves out a much wider range of deductible sources of income, sources potentially unrelated to any disability, or it is bounded by the preceding six, and pertains only to disability-related payments.

Because it is susceptible to two different readings, the deductible income clause is ambiguous. That ambiguity must be resolved in Rustad-Link's favor, meaning that the offset for income described at paragraph seven must be narrowly construed. Such a reading is supported by the manner in which the Plan calculates disability benefits—as a percentage of "monthly earnings," at her workplace (and not as a percentage of any income she might receive). (Doc. 16-3 at 28; AR 000028.) Rustad-Link's settlement states that "Releasor [Rustad-Link] represents that no amount of the Settlement payment is allocated to lost wages." (Doc. 16-17 at 148; AR 002129.) While that self-serving characterization does not bind the Plan, Unum nonetheless bore the burden of disputing that contention by showing it was reasonably entitled to offset under the Plan. But Unum failed to take the reasonable course.

Rustad-Link is entitled to reinstatement of the full amount of the amputation

settlement offset Unum has taken against her disability payments. First, Unum's definition of "same disability" is unreasonably self-serving. Second, Unum's assertion of the deductible source of income offset rests on an ambiguous policy provision that must be read in Rustad-Link's favor. This conclusion does not mean that all third-party settlements would be beyond the reach of the Plan's deductible sources of income, nor that simply allocating settlement proceeds away from wages would prevent a reasonable offset. Instead, it reflects that Unum has attempted to benefit from Rustad-Link's misfortune by unreasonably asserting an offset against a settlement for a different disabling condition. Thus while neither party's absolutist argument is compelling, applying "a fair, reasonable, and sensible construction as would be given to the [Plan] by the average person purchasing insurance," *Quadrant*, 110 P.3d at 737, means Rustad-Link prevails here.

## C. Attorney's Fees

Rustad-Link also requests attorney's fees. ERISA provides that, in an action brought by a plan beneficiary, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Section 1132(g)(1) "does not expressly demand, like so many statutes, that a claimant be a prevailing party before receiving attorney's fees."

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010) (quotation

marks omitted). Therefore, "[a] fee claimant need not be a prevailing party to be

eligible for an attorney's fees award under [it]." *Id.* (quotation marks omitted).

Under § 1132(g)(1), "a fees claimant must show some degree of success on the

merits before a court may award attorney's fees." *Id.* at 255 (quotation omitted).

"A claimant does not satisfy that requirement by achieving trivial success on the

merits or a purely procedural victory, but does satisfy it if the court can fairly call

the outcome of the litigation some success on the merits without conducting a

lengthy inquiry into the question whether a particular party's success was

substantial or occurred on a central issue." *Id.* (quotations and alterations

omitted).

Rustad-Link has shown Unum wrongfully deducted against her disability

benefits, and that Unum should be required to reinstate her present and future

benefits without an offset against her settlement. An award of reasonable

attorney's fees is appropriate.

## CONCLUSION

IT IS ORDERED that Rustad-Link's motion for summary judgment (Doc.

17) is GRANTED. Unum's motion (Doc. 24) is DENIED.

IT IS FURTHER ORDERED that Unum shall reimburse Rustad-Link for

the benefits it withheld, and shall reinstate her present and future benefits without the offset.

IT IS FURTHER ORDERED that Rustad-Link shall submit a request for fees and costs, supported by affidavit and other documentation, within 14 days of the date of this Order. Unum shall have 14 days to respond to Rustad-Link's request.

Rustad-Link requests an award of pre-judgment interest, but the issue has not been briefed. Accordingly,

IT IS FURTHER ORDERED that Rustad-Link shall submit a reasoned request for an award of pre-judgment interest within 14 days of the date of this Order. Unum shall have 14 days to respond to Rustad-Link's request.

DATED this _30th_ day of January, 2018.

Donald W. Molloy, District Judge
United States District Court